

MAR 0 2 2006

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION **3:06CV7069**

**JUDGE KATZ**

| | |
|---|---|
| STEVEN STAEHR, Derivatively On Behalf of DANA CORPORATION, | Civil Action No. _____ |
| Plaintiff, | DERIVATIVE ACTION |
| vs. | |
| MICHAEL J. BURNS, ROBERT C. RICHTER, RICHARD B. PRIORY, A. CHARLES BAILLIE, MARILYN R. MARKS, EDMUND M. CARPENTER, JAMES P. KELLY, CHERYL W. GRISÉ, SAMIR G. GIBARA, DAVID E. BERGES, RICHARD M. GABRYS, GLEN H. HINER, BENJAMIN F. BAILAR, ERIC CLARK AND FERNANDO M. SENDEROS, | |
| Defendants, | |
| – and – | |
| DANA CORPORATION, a Virginia corporation, | |
| Nominal Defendant. | JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CONSTRUCTIVE FRAUD, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, BREACH OF FIDUCIARY DUTIES AND FOR VIOLATIONS OF THE SARBANES-OXLEY ACT OF 2002**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

**NATURE OF THE ACTION**

1.    This is a shareholder derivative action brought by a shareholder of Dana Corporation

("Dana" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties. abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the Sarbanes-Oxley Act of 2002 that occurred between April 2000 and the present (the "Relevant Period") and that have caused substantial losses to Dana and other damages, such as to its reputation and goodwill.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 in that plaintiff's claims arise in part under the Constitution and laws of the United States, including the Sarbanes-Oxley Act of 2002.

3.      This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Dana occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### SUMMARY OF THE ACTION

2.      Dana designs and manufactures products for every major vehicle producer in the world.  Dana is focuses on supplying axle, driveshaft, engine, frame, chassis, and transmission technologies to automotive, commercial, and off-highway vehicle customers.

3.      On October 10, 2005, the defendants caused or allowed the Company to issue a press release announcing that accounting problems would force Dana to: (i) restate earnings for FY:04 and

the first half of FY:05: (ii) delay the posting of its 3Q:05 earnings: and (iii) formally investigate the

material weaknesses in the Company's internal controls with respect to financial reporting.

    4.    On November 16, 2005. the defendants caused or allowed the Company to file a

Form 8-K with the SEC, which stated in relevant part:

> On November 11, 2005, Dana's management and Audit Committee determined that the *restatement of the company's 2004 financial statements will trigger the accounting requirements to restate its financial statements for the years 2002 and 2003 and its financial results for the years 2000 and 2001 should no longer be relied upon.*

* * *

> In connection with the restatements. the company believes that there are material weaknesses in its internal controls over financial reporting.

> Dana will prepare amended reports on Forms 10-Q/A for the first and second quarters of 2005 and on Form 10-K/A for the year ended December 31, 2004. The From 10-K/A for 2004 will include restated financial statements for each of the years 2002 through 2004 and restated financial results in the Selected Financial Data for the years 2000 and 2001.

    5.    Then on December 23, 2005. the defendants caused or allowed the Company to issue

a press release entitled "Dana Corporation Provides Update on Restatements," which stated in

relevant part:

> Dana Corporation announced today that it *is nearing completion of the restatements of its financial statements for the first two quarters of 2005 and prior years, and reaffirmed that it expects to file amended annual and quarterly reports for the applicable periods* with the U.S. Securities and Exchange Commission prior to the end of the year.

> The primary items prompting the restatements were issues involving customer pricing and transactions with suppliers in Dana's Commercial Vehicle business. These and other matters have been the subject of internal investigations conducted by management and the Audit Committee of Dana's Board of Directors in consultation with independent investigators retained by the Audit Committee and have been reviewed with the company's independent registered public accounting firm. PricewaterhouseCoopers LLP.

> The total reduction in net income after tax for all periods to be restated is now expected to be approximately $50 million. This amount exceeds earlier estimates due to the effect of a correction with respect to steel surcharges in the prior calculation of the company's 2004 LIFO inventory reserves.

    6.    On December 30, 2005, the defendants caused or allowed the Company to announce

that it had completed a restatement of FY:00 to Q2:05. The net effect of the restatement was to

reduce net income after tax for all periods by $44 million. The *Associated Press* published an article

concerning the restatement entitled "Auto Parts Supplier Dana Corp. Lowers Net Income by $44

Million in Amended Reports to the SEC." The article stated in relevant part:

> *Auto parts supplier Dana Corp. said Friday it lowered profits by $44 million for a period starting in 2000 and ending in June in adjusted reports to the Securities and Exchange Commission.*
>
> Dana filed amended financial statements for the first quarter of 2000 through the first two quarters of 2005, completing a company review of its financial reports. *It said the changes were caused by improper accounting for customer pricing increases and supplier reimbursement costs in the company's commercial vehicle unit.*
>
> *"During our investigations, we identified material weaknesses in our system of internal control over financial reporting and we have taken, and will continue to take, appropriate actions to remediate these weaknesses,"* said Michael Burns, Dana's chairman and chief executive.

7. On February 1. 2006, the defendants caused or allowed the Company to file a Form 8-

K with the SEC that announced that the SEC had initiated a formal investigation into Dana's

accounting improprieties. The 8-K stated in relevant part:

> *Dana has now been advised that the SEC issued a formal order of investigation with respect to matters related to the company's restatements.* The SEC's investigation is a non-public, fact-finding inquiry to determine whether any violations of the law have occurred. Dana will continue to cooperate fully with the SEC in its investigation of these matters.

8. The true facts, which were known or should have been known by each of the

defendants but concealed from the investing public and the Company's shareholders during the

Relevant Period, were as follows:

      (a)    the Company lacked requisite internal controls, and, as a result, the

Company's projections and reported results were based upon defective assumptions and/or

manipulated facts:

      (b)    the Company lacked the necessary personnel to issue accurate financial

reports and projections:

      (c)    the Company's financial statements were presented in violation of Generally

Accepted Accounting Principles ("GAAP") as described herein; and

      (d)    as a result of (a)-(c) above, the Company restated FY:00 through 2Q:05.

## THE PARTIES

9. Plaintiff Steven Staehr ("Staehr") is, and was at times relevant hereto, an owner and

holder of Dana common stock.  Plaintiff is a citizen of Nevada.

10.    Nominal defendant Dana is a corporation organized and existing under the laws of the state of Virginia with its headquarters located at 4500 Dorr Street, Toledo, Ohio.

11.    Defendant Michael J. Burns ("Burns") is, and at times relevant hereto was, Chairman of the Board of Directors (the "Board"), President and Chief Executive Officer ("CEO") of Dana since March 2004.  Because of Burns' positions, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Burns participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:04, Dana paid defendant Burns $5,828,711 in salary, bonus, restricted stock awards and other compensation, and granted him 510,000 options to purchase Dana stock.  Defendant Burns is a citizen of Ohio.

12.    Defendant Robert C. Richter ("Richter") is, and at all times relevant hereto was, Vice President and Chief Financial Officer ("CFO") of Dana.  Because of Richter's positions, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Richter participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:00, FY:01, FY:02, FY:03 and FY:04, Dana paid defendant Richter $552,440, $1,012,798, $746,758, $809,158 and $849,243, in salary, bonus, restricted stock awards and other compensation, and granted him 55,000, 55,000, 55,000, 55,000 and 34,000 options to purchase Dana stock.  Defendant Richter is a citizen of Ohio.

13.    Defendant Richard B. Priory ("Priory") is, and at all times relevant hereto was, a director of Dana.  Because of Priory's position, he knew the adverse non-public information about

the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Priory participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Priory is a citizen of Florida.

14.     Defendant A. Charles Baillie ("Baillie") is, and at all times relevant hereto was, a director of Dana. Because of Baillie's position, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Baillie participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Baillie is a citizen of Canada.

15.     Defendant Marilyn R. Marks ("Marks") is, and at all times relevant hereto was, a director of Dana. Because of Marks' position, she knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Marks participated in the issuance of false and/or misleading statements, including the SEC filings. Defendant Marks is a citizen of Colorado.

16.     Defendant Edmund M. Carpenter ("Carpenter") is, and at all times relevant hereto was, a director of Dana. Because of Carpenter's position, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant

Period, Carpenter participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Carpenter is a citizen of Connecticut.

17.     Defendant James P. Kelly ("Kelly") is, and at times relevant hereto was, a director of Dana since April 2002. Because of Kelly's position, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Kelly participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Kelly is a citizen of Georgia.

18.     Defendant Cheryl W. Grisé ("Grisé") is, and at times relevant hereto was, a director of Dana since December 2002. Because of Grisé's position, she knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Grisé participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Grisé is a citizen of Connecticut.

19.     Defendant Samir G. Gibara ("Gibara") is, and at times relevant hereto was, a director of Dana since April 2004. Because of Gibara's position, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Gibara participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Gibara is a citizen of Ohio.

20.     Defendant David E. Berges ("Berges") is, and at times relevant hereto was, a director of Dana since April 2004. Because of Berges' position, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Berges participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Berges is a citizen of Connecticut.

21.     Defendant Richard M. Gabrys ("Gabrys") is, and at times relevant hereto was, a director of Dana since December 2004. Because of Gabrys' position, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Gabrys participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Gabrys is a citizen of Michigan.

22.     Defendant Glen H. Hiner ("Hiner") was, at times relevant hereto, a director of Dana at until April 2005. Hiner was Chairman of the Board of Dana from February 2004 to April 2005. Before serving as Chairman, Hiner served as Acting Chairman of Dana from September 2003 to February 2004. Because of Hiner's positions, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Hiner participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Hiner is a citizen of California.

23.     Defendant Benjamin F. Bailar ("Bailar") was, at times relevant hereto, a director of Dana until April 2005.  Because of Bailar's position, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Bailar participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Bailar is a citizen of Illinois.

24.     Defendant Eric Clark ("Clark") was, at times relevant hereto, a director of Dana at until April 2004.  Because of Clark's position, he knew the adverse non public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Clark participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Clark is a citizen of the United Kingdom.

25.     Defendant Fernando M. Senderos ("Senderos") was, at times relevant hereto, a director of Dana until April 2004.  Because of Senderos' position, he knew the adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Senderos participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Senderos is a citizen of Mexico.

26.     The defendants identified in ¶¶11, 13-25 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶11, 12 are referred to herein as the "Officer Defendants."  Collectively, the Director Defendants and the Officer Defendants are referred to herein

- 8 -

as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers, directors and/or fiduciaries of Dana and because of their ability to control the business and corporate affairs of Dana, the Individual Defendants owed Dana and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Dana in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Dana and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.     Each director and officer of the Company owes to Dana and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Dana, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Dana, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of Dana.

30.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Dana, and was at all times acting within the course and scope of such agency.

31.     To discharge their duties, the officers and directors of Dana were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Dana were

required to. among other things:

      (a)     refrain from acting upon material inside corporate information to benefit themselves:

      (b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

      (c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

      (e)     remain informed as to how Dana conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

      (f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal. state and local laws, rules and regulations.

      32.     Each Individual Defendant. by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty. good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Dana. the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the

Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Dana's Board during the Relevant Period.

33.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, Dana has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending Dana and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

34.     Moreover, these actions have irreparably damaged Dana's corporate image and goodwill. For at least the foreseeable future, Dana will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Dana's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

36.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to

- 11 -

artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Dana and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Dana, regarding the Individual Defendants' management of Dana's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least April 2000 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Dana was misrepresenting its financial results. In addition, defendants also made other specific, false statements about Dana's financial performance and future business prospects, as alleged herein.

38.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Dana common stock so they could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

39.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

40.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

- 12 -

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IMPROPER STATEMENTS

41.     The Individual Defendants, by their fiduciary duties of care, good faith and loyalty owed to Dana a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. This material non-public information included Dana's lack of adequate internal financial controls and financial personnel shortage. Furthermore, defendants Gabrys, Marks, Carpenter and Grisé, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the Audit Committee is responsible for discussing earnings releases and announcements, as well as financial information and earnings guidance provided to analysts and rating agencies. Defendants Burns and Richter, as officers of Dana, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Burns, Gabrys, Marks, Carpenter, Grisé, Priory, Berges, Baillie, Kelly and Gibara, as directors of Dana had ample opportunity to discuss this material information with management and fellow directors at any of the 13 Board meetings that occurred during the Relevant Period as well as at meetings of Committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Dana to the investing public and the Company's shareholders during the Relevant Period.

42.     On April 18, 2000, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Announces First-Quarter Results." The press release stated in relevant part:

> Dana Corporation today announced that first-quarter sales continued to be strong, at nearly $3.5 billion. Despite recent divestitures, this represents an increase of more than 2 percent over the same period last year. Operating income for the quarter amounted to $160 million, or $1.01 per share, in line with analysts' expectations. In the first quarter of 1999, Dana recorded operating income of $167 million, or $1.00

per share.

* * *

Dana Chairman and CEO Joe Magliochetti said, "Dana experienced another quarter of strong demand for our vehicular products in North America. Our people deserve a lot of credit for enabling us to meet the needs of our customers during a period when light vehicular production reached an annualized rate of nearly 18 million units. While we continue to be successful in meeting these demands without adding permanent capacity, this level of production has resulted in increased costs associated with overtime and premium freight that continue to put pressure on margins. especially in our Automotive Systems and Engine Systems groups.

43.     Dana's financial results for 1Q:00 were repeated in the Company's Form 10-Q filed

with the SEC on or about May 15, 2000. The Form 10-Q was signed by defendant Richter.

44.     On July 18, 2000, the Individual Defendants caused or allowed the Company to issue

a press release entitled "Dana Corporation Announces Second-Quarter Results: Earnings in Line

with Previously Announced Expectations." The press release stated in relevant part:

Dana Corporation today announced its results for the quarter ended June 30. Sales were approximately $3.3 billion, down slightly from record sales of $3.4 billion last year. Recent divestitures more than accounted for this difference.

Operating income for the quarter totaled $154 million, or $1.01 per share. Including non-recurring expenses of $9.6 million after tax, reported net income for the period was $145 million. or 95 cents per share. For the second quarter of 1999. the company reported net income of $190 million or $1.14 per hare. Last year's results included approximately $5 million of non-recurring after-tax expenses.

45.     Dana's financial results for 2Q:00 were repeated in the Company's Form 10-Q filed

with the SEC on or about August 8, 2000. The Form 10-Q was signed by defendant Richter.

46.     On October 17, 2000. the Individual Defendants caused or allowed the Company to

issue a press release entitled "Dana Corporation Announces Third-Quarter Results: Earnings in Line

with Previously Announced Expectations." The press release stated in relevant part:

Dana Corporation today announced that its sales for the quarter ended Sept. 30 were $2.9 billion, down from $3.1 billion for the same period last year.

Operating income for the quarter totaled $61 million, or 41 cents per share -- in line with expectations announced by the company on Sept. 18. Reported net income for the period was $29 million, or 19 cents per share. This included net non-recurring expenses of $32 million after tax, primarily attributable to the closure of the company's Reading, Pa., Structural Products facility. For the third quarter of 1999. the company reported net income of $162 million or 97 cents per share. Last year's results included approximately $11 million of non-recurring after-tax charges.

47.     Dana's financial results for 3Q:00 were repeated in the Company's Form 10-Q filed

with the SEC on or about November 6, 2000. The Form 10-Q was signed by defendant Richter.

48.    On February 13, 2001, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Announces Year-End Results." The press release stated in relevant part:

> Dana Corporation today announced consolidated sales of $12.3 billion for the year ended Dec. 31, 2000, down 6 percent from 1999. Operating income for the year was $377 million, or $2.46 per share. After net non-recurring charges of $43 million, reported net income for the year was $334 million, or $2.18 per share on a diluted basis. In 1999, operating income totaled $678 million ($4.07 per share) and reported net income was $513 million ($3.08 per share) after non-recurring charges.
>
> Sales for the fourth quarter of 2000 were $2.7 billion, down from $3.2 billion for the same period last year. Operating earnings were $2 million, or one cent per share on a diluted basis. The company also reported net non-recurring charges of $86 million (58 cents per share), compared to $144 million (87 cents per share) for the quarter in 1999.

49.    Dana's financial results for FY:00 were repeated in the Company's Form 10-K filed with the SEC on or about March 1, 2001. The Form 10-K contained the signatures of defendants Richter, Bailar, Baillie, Carpenter, Clark, Hiner, Marks, Priory and Senderos.

50.    On April 18, 2001, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Announces First-Quarter Results." The press release stated in relevant part:

> Dana Corporation today announced that its sales for the first quarter of 2001 were $2.7 billion, down from $3.5 billion for the same period last year. Operating earnings per share totaled one cent on a diluted basis, exceeding consensus estimates.
>
> The company also reported net non-recurring charges of $28 million (19 cents per share). These charges included a one-time loss associated with the sale of the Mr. Gasket aftermarket operations, as well as charges related to facility closures and permanent workforce reductions. The resulting net loss reported for the quarter was $27 million (18 cents per share). This compares to net income of $245 million in the first quarter of last year, which included a net non-recurring gain of $85 million.

51.    Dana's financial results for 1Q:01 were repeated in the Company's Form 10-Q filed with the SEC on or about May 4, 2001. The Form 10-Q was signed by defendant Richter.

52.    On July 17, 2001, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Announces Second-Quarter Results." The press release stated in relevant part:

> Dana Corporation today announced that its sales for the second quarter of 2001 were $2.8 billion, down from $3.3 billion for the same period last year. Net income, excluding non-recurring items, totaled $26 million, or 17 cents per share for the

- 15 -

quarter, compared with $154 million, or $1.01 per share, during the second quarter of 2000. Net income for the quarter, including non-recurring items, totaled $14 million, or 10 cents per share. This compares with net income of $145 million, or 95 cents per share, in the second quarter of 2000.

Dana's six-month consolidated sales were $5.5 billion, down from $6.8 billion over the same period last year. Net income, excluding non-recurring items over the period, was $27 million, or 18 cents per share, compared with $315 million, or $2.01 per share, in 2000. After net, non-recurring charges, the company incurred a net loss of $13 million, or 8 cents per share, during the first six months of 2001. This compares with net income of $390 million, or $2.50 per share in 2000, which included net, non-recurring income of $75 million, or 49 cents per share.

53.     Dana's financial results for 2Q:01 were repeated in the Company's Form 10-Q filed with the SEC on or about August 14, 2001. The Form 10-Q was signed by defendant Richter.

54.     On October 17, 2001, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Announces Third-Quarter Results, Takes Actions to Enhance Financial and Competitive Position." The press release stated in relevant part:

Dana Corporation today announced its third-quarter results, including sales of $2.4 billion and a net, loss, excluding non-recurring items, of $8 million, or 5 cents per share, in line with previously announced expectations. Including non-recurring items, the company recorded a net profit of $13 million, or 8 cents per share. The company also announced actions to enhance its financial position and overall competitiveness.

55.     Dana's financial results for 3Q:01 were repeated in the Company's Form 10-Q filed with the SEC on or about November 13, 2001. The Form 10-Q was signed by defendant Richter.

56.     On February 13, 2002, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Announces Year-End Results and Progress on Restructuring Actions." The press release stated in relevant part:

Dana Corporation today announced sales of $10.3 billion for the year ended Dec. 31, 2001, down 17 percent from 2000. The company reported a net loss for the year of $298 million, or $2.01 per share on a diluted basis, after net non-recurring charges of $303 million. Income excluding these non-recurring items was $5 million, or 4 cents per share. In 2000, reported net income was $334 million ($2.18 per share) after net non-recurring charges, and income excluding non-recurring items was $377 million ($2.46 per share).

Sales for the fourth quarter of 2001 were $2.4 billion, down from $2.7 billion for the same period last year. The company reported a fourth-quarter net loss of $298 million ($2.01 per share) after net non-recurring charges of $284 million. The loss for the quarter, excluding the non-recurring items, was $14 million, or 9 cents per share on a diluted basis. In the fourth quarter of 2000, the net loss was $84 million (53 cents per share) after net non-recurring charges, and income excluding non-recurring items was $2 million (1 cent per share).

57.     Dana's financial results for FY:01 were repeated in the Company's Form 10-K filed with the SEC on or about February 26, 2002. The Form 10-K contained the signatures of defendants Richter, Bailar, Baillie. Carpenter. Clark, Hiner, Marks, Priory and Senderos.

58.     On April 17, 2002, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Announces First-Quarter Results." The press release stated in relevant part:

> Dana Corporation today announced its first-quarter results, which included the impact of the company's previously announced restructuring program and the required adoption of new accounting standard FAS 142.
>
> Operating Performance
>
>      The company reported first-quarter sales of $2.5 billion and net income, excluding non-recurring charges, of $28 million or 18 cents per share. During the same period last year, the company's sales were $2.7 billion and net income, excluding non-recurring items, was $1 million.

59.     Dana's financial results for 1Q:02 were repeated in the Company's Form 10-Q filed with the SEC on or about May 7, 2002. The Form 10-Q was signed by defendant Richter.

60.     On July 17, 2002. the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Reports Second-Quarter Earnings." The press release stated in relevant part:

> Dana Corporation announced improved second-quarter earnings today, largely due to the benefits of its restructuring actions.
>
>      Second-quarter sales were $2.8 billion, comparable to sales for the same period last year.  Net income totaled $52 million. or 35 cents per share. This compares with net income of $14 million, or 10 cents per share, during the second quarter of 2001, which included goodwill amortization of $8 million after tax.
>
>      Net income this quarter included $42 million of charges related to Dana's restructuring plan announced last October. These charges were partially offset by a $27 million gain from the sale of selected subsidiaries of its Dana Credit Corporation (DCC) leasing services unit.

61.     Dana's financial results for 2Q:02 were repeated in the Company's Form 10-Q filed with the SEC on or about August 14, 2002. The Form 10-Q was signed by defendant Richter.

62.     On October 25, 2002. the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Reports Third-Quarter Earnings; Restructuring Actions Continue to Produce Benefits." The press release stated in relevant part:

> Dana Corporation today announced improved third-quarter sales and operating

- 17 -

earnings strengthened by sustained progress in its restructuring actions. Sales for the period were $2.6 billion, up 7 percent from 2001.

During the third quarter, Dana recorded after-tax charges of $40 million as part of its $445 million restructuring plan announced one year ago. This brings total charges recorded to date to $398 million, or approximately 90 percent of the total program. Net income, after restructuring charges and other non-recurring items, totaled $4 million, or 2 cents per share. This compares with net income of $13 million, or 8 cents per share, during the same period last year that included goodwill amortization of $9 million after tax.

63.     Dana's financial results for 3Q:02 were repeated in the Company's Form 10-Q filed

with the SEC on or about October 30, 2002. The Form 10-Q was signed by defendant Richter. The

Form 10-Q also contained a certification signed by defendant Richter under section 302 of the

Sarbanes-Oxley Act of 2002 that provided in part:

1.     I have reviewed this quarterly report on Form 10-Q of Dana Corporation;

2.     Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.     Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

64.     On February 12, 2003, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Dana Corporation Announces 2002 Results; Restructuring Actions

Drive Improvements." The press release stated in relevant part:

Dana Corporation today announced improved results for the fourth-quarter and full-year 2002 due largely to the successful execution of the company's restructuring plan unveiled in October 2001.

"One year ago, we identified the rapid execution of our restructuring plan as Dana's primary focus for 2002," said Dana Chairman and CEO Joe Magliochetti. "Today, it's clear that we've delivered on this objective.

*   *   *

Sales from continuing operations were $9.5 billion, comparable to the prior year. Excluding the non-recurring items noted above, operating profit totaled $171 million, or $1.15 per share. This compares to $5 million, or 4 cents per share, on a similar basis in 2001. Earnings in 2001 were reduced by $32 million of goodwill amortization.

*   *   *

Sales from continuing operations were $2.3 billion for the fourth quarter of 2002, compared to $2.2 billion during the same period last year. During the quarter,

- 18 -

Dana recorded after-tax charges of $44 million, representing the final expenses associated with the restructuring plan announced in October 2001. After restructuring charges and other non-recurring items, the company reported a net loss for the quarter of $9 million, or 6 cents per share. This compares with a net loss of $298 million, or $2.01 per share, during the same period last year.

65. Dana's financial results for FY:02 were repeated in the Company's Form 10-K filed with the SEC on or about February 25, 2003. The Form 10-K contained the signatures of defendants Richter, Bailar, Baillie, Carpenter, Clark, Grisé, Hiner, Kelly, Marks, Priory and Senderos. Dana's 10-K also contained a certification signed by defendant Richter under Section 302 of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical to Dana's 3Q:02 Form 10-Q certification.

66. On April 24, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Announces Stronger First-Quarter Results; Restructuring Continues to Drive Improvement." The press release stated in relevant part:

Dana Corporation today announced first-quarter sales of $2.4 billion and net income of $41 million, or 28 cents per share. In the first quarter of 2002, Dana reported sales of $2.3 billion and a net loss of $229 million, or $1.54 per share.

67. Dana's financial results for 1Q:03 were repeated in the Company's Form 10-Q filed with the SEC on or about May 1, 2003. The Form 10-Q was signed by defendant Richter. The Form 10-Q also contained a certification signed by defendant Richter under section 302 of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical to Dana's 3Q:02 Form 10-Q certification.

68. On July 22, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Reports Second-Quarter Earnings." The press release stated in relevant part:

Dana Corporation today announced second-quarter sales of $2.5 billion and net income of $52 million, or 35 cents per share. This compares to sales of $2.6 billion and net income of $52 million during the same period last year.

"We entered the quarter knowing that we faced ongoing challenges within our Automotive Aftermarket Group and start-up costs associated with program launches in our Structural Solutions group," said Dana Chairman and CEO Joe Magliochetti. "Nevertheless, the benefits of the company's restructuring program helped us exceed consensus earnings estimates for the quarter.

69. Dana's financial results for 2Q:03 were repeated in the Company's Form 10-Q filed

- 19 -

with the SEC on or about July 25, 2003. The Form 10-Q was signed by defendant Richter. The Form 10-Q also contained a certification signed by defendant Richter under section 302 of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical to Dana's 3Q:02 Form 10-Q certification.

70.     On October 24, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Reports Stronger Third-Quarter Earnings." The press release stated in relevant part:

> Dana Corporation today announced third-quarter net income totaling $61 million, or 41 cents per share, on sales of $2.4 billion. These results are a significant improvement over net income of $4 million, or 2 cents per share, on sales of $2.4 billion during the same period last year.

71.     Dana's financial results for 3Q:03 were repeated in the Company's Form 10-Q filed with the SEC on or about October 28, 2003. The Form 10-Q was signed by defendant Richter. The Form 10-Q also contained a certification signed by defendant Richter under section 302 of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical to Dana's 3Q:02 Form 10-Q certification.

72.     On February 11, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Reports Increased Earnings." The press release stated in relevant part:

> Dana Corporation announced improved performance for the fourth-quarter and full-year 2003, and increased its dividend payment for the first quarter of 2004. Specifically:
>
> • Fourth-quarter net income increased to $68 million from a loss of $9 million during the same period of the prior year;
>
> • Full-year net income improved to $222 million from a loss of $182 million in 2002; and
>
> • The quarterly dividend was doubled from 6 to 12 cents per share.
>
> "Notwithstanding the extraordinary challenges Dana faced in 2003, *we continued to execute on our restructuring plan and, as a result, improved our earnings and strengthened our balance sheet,*" said Dana Chairman Glen Hiner. "*Building on this foundation, we begin the new year with renewed momentum, exciting programs with a diverse group of global customers, and a sharpened strategic focus.*"
>
> * * *
>
> Commenting on the current year, Mr. Richter said the company anticipates

- 20 -

increased sales in its key global markets: light vehicular, heavy vehicle, and off-highway. "Along with favorable market conditions. particularly in the North American heavy-truck segment. we expect to benefit more fully from our restructuring. which is now essentially complete." he said.

* * *

"We take pride in the efforts of our people over the last two years." Mr. Hiner added. *"We believe our significant progress in realigning and refocusing Dana. in combination with the expected upturn in our global markets, bodes well for a solid 2004 and beyond."*

73.     Dana's financial results for FY:03 were repeated in the Company's Form 10-K filed with the SEC on or about February 25. 2004. The Form 10-K contained the signatures of defendants Richter. Bailar, Baillie, Carpenter, Clark. Grisé. Hiner, Kelly, Marks, Priory and Senderos.  Dana's 10-K also contained a certification signed by defendant Richter under Section 302 of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical to Dana's 3Q:02 Form 10-Q certification.

74.     On April 21, 2004. the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Reports Stronger First-Quarter Results; Increased Volume and Cost Reductions Drive Improvement." The press release stated in relevant part:

Dana Corporation today announced that its 2004 first-quarter sales were $2.3 billion compared to $2.0 billion during the same period last year. Net income for the quarter totaled $63 million, or 42 cents per share. compared to net income of $41 million, or 28 cents per share. for the period in 2003. First-quarter 2004 net income included $2 million of unusual net gains on the sale of Dana Credit Corporation (DCC) assets. while income during the same period last year included $10 million in comparable gains.

"*We are very pleased with the continued progress demonstrated by our first-quarter performance.*" said Dana Chairman and CEO Mike Burns. "Our profit improvement was driven by a combination of higher production volumes. new business programs. and the continued realization of benefits from our restructuring and other cost-reduction efforts."

First-quarter sales were up 17 percent over the comparable period last year. While 2004 sales benefited from $125 million of currency translation. the majority of the sales increase was driven by new business programs and higher production volumes in the principal markets served by Dana. particularly the North American heavy-truck sector.

Profit from continuing operations -- those operations not included in the company's proposed divestiture of its aftermarket business -- was $50 million, or 33 cents per share. in the first quarter of 2004. compared to $36 million or 25 cents per share during the first quarter of 2003. Excluding the unusual gains from DCC asset sales, this represents an 85 percent quarter-over-quarter improvement.

"Our improved profitability was evident in a higher operating margin." Mr.

- 21 -

Burns said. "In fact, our margin improvement would have been even better if not for continued launch-related costs in our structures group. While these costs are not yet fully behind us, *we took further actions to address the remaining issues in the first quarter and are confident that we will see improvement in the second quarter*."

75.     Dana's financial results for 1Q:04 were repeated in the Company's Form 10-Q filed with the SEC on or about April 29, 2004. The Form 10-Q was signed by defendant Richter. The Form 10-Q also contained certifications signed by defendants Richter and Burns under section 302 of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical to Dana's 3Q:02 Form 10-Q certification.

76.     On July 21, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Reports Significantly Improved Operational Results; Net Income Also Includes Net Gains Triggered by Transactions." The press release stated in relevant part:

> Dana Corporation today announced that its 2004 second-quarter sales were $2.3 billion, compared to $2.0 billion during the same period last year. Net income for the quarter (including $33 million of unusual net gains) totaled $108 million, or 72 cents per share. This compares to net income (including $5 million of unusual net gains) of $52 million, or 35 cents per share, for the period in 2003.
>
>      "*We are pleased to have delivered another solid quarter of operational performance with net income, exclusive of unusual items, up 60 percent*," said Dana Chairman and CEO Mike Burns. "At the same time, we're far from satisfied and continue to pursue greater focus, integration, and productivity in line with our commitment to meeting the needs of our global customers."
>
>      Second-quarter sales were up 16 percent over the same period last year with the majority of the increase being driven by our new business programs and higher production volumes in the principal markets served by Dana, particularly the North American heavy-truck sector.
>
>      "Our solid sales growth contributed to stronger bottom-line results," Mr. Burns said. "In addition, we continued to see growth in our gross margin – both year-over-year and sequentially by quarter – as we achieved further cost efficiencies and made progress in addressing the launch costs associated with our structures programs. It's important to note that these improvements were achieved in spite of the higher cost of steel and certain other raw materials that we experienced during the quarter.
>
>                                     *   *   *

First-Half Results Significantly Improved

Dana's six-month consolidated sales were $4.6 billion, up from $4.0 billion during the same period last year. Net income during the first half of 2004 was $171 million, or $1.14 per share, including $35 million in unusual net gains. This compares to net income of $93 million, or 63 cents per share, including $15 million in unusual net gains during the initial six months of 2003.

"Excluding our unusual items and the results of businesses held for sale, our net income from continuing operations improved by more than 60 percent during the first half of 2004, compared to the same period last year," Mr. Burns said. "Again, this improvement was largely the result of new business and strong production volumes in our principal markets."

Full-Year EPS Guidance

"While we are optimistic about production levels in the North American heavy-truck sector, the second half of the year will not be without its challenges," Mr. Burns said. "We will continue to be impacted by many of the challenges that we experienced during the first six months of the year, particularly higher raw material costs. In addition, rising North American light-vehicle inventory levels also point to the potential for reductions in production schedules in that sector during the second half of the year.

"So even though we will continue to consolidate the results of the automotive aftermarket business until the sale closes, we are not changing our earnings guidance of at least $1.90 per share, excluding unusual items, in 2004."

77.     Dana's financial results for 2Q:04 were repeated in the Company's Form 10-Q filed with the SEC on or about July 26, 2005. The Form 10-Q was signed by defendant Richter. The Form 10-Q also contained certifications signed by defendants Richter and Burns under section 302 of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical to Dana's 3Q:02 Form 10-Q certification.

78.     On October 20, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Reports Third-Quarter Earnings." The press release stated in relevant part:

Dana Corporation today announced third-quarter sales of $2.1 billion, compared to $1.9 billion during the same period last year. Net income for the quarter totaled $40 million, or 27 cents per share, compared to $61 million, or 41 cents per share, for the period in 2003.

*   *   *

Excluding unusual items, third-quarter 2004 net income was $60 million, or 40 cents per share, compared to $43 million, or 29 cents per share for the period last year. Third-quarter 2004 results, however, included the impact from several positive tax developments, including the adjustment of the company's effective tax rate for the year to 31 percent. The reduction in the effective rate reflects, among other items, credits for research and development costs. In addition, a tax benefit of $24 million

- 23 -

was recorded to recognize the utilization of capital loss carryforwards related to the settlement of certain issues with tax authorities, as well as adjustments associated with the finalization of the prior-year's tax returns.

"Setting aside taxes, it was an otherwise disappointing quarter, largely because of the increasing cost of raw materials," said Dana Chairman and CEO Mike Burns. "The increase in steel costs alone totaled $22 million after tax, net of recoveries from our customers.

"We had expected that the bottom-line impact of the commodity price increases would be offset by the stronger performance in our heavy-vehicle business and continuing cost-reduction efforts," he added. "But, the magnitude of the raw material increases, coupled with a decrease in light-vehicle production volumes, hit us harder than expected."

* * *

"We believe that raw material costs will continue to adversely affect us, at least in the near term," Mr. Burns said. "As we move into 2005, however, we can expect more of an offsetting benefit from our cost reduction programs. These include the consolidation of our purchasing function, the accelerated deployment of lean manufacturing techniques, and the standardization of administrative processes throughout the company.

"At the same time, we are not solely focused on cutting costs," he said. "We are equally committed to growing our top line faster - we've added significantly to our book of new business over the last three months, the heavy-truck and off-highway markets continue to grow, and we are focused on expanding our global footprint."

79.     Dana's financial results for 3Q:04 were repeated in the Company's Form 10-Q filed with the SEC on or about November 9, 2004. The Form 10-Q was signed by defendant Richter. The Form 10-Q also contained certifications signed by defendants Richter and Burns under section 302 of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical to Dana's 3Q:02 Form 10-Q certification.

80.     On February 23, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Reports Fourth-Quarter and Full-Year Results." The press release stated in relevant part:

Dana Corporation today announced its fourth-quarter and full-year 2004 results. During the fourth quarter, Dana took a series of actions aimed at strengthening its long-term competitiveness and repositioning the company to better serve its global original equipment customers. These actions, which together resulted in unusual charges of $195 million after tax, included:

• Completing the divestiture of the automotive aftermarket businesses previously held for sale;

• Announcing two facility closures and other manufacturing realignments; and

- Repurchasing approximately $900 million of long-term debt.

"The aftermarket divestiture, our realignment actions, and the debt repurchase significantly improved our balance sheet and financial flexibility. Our efforts were recognized by two leading credit agencies, which returned us to investment grade in December," said Dana Chairman and CEO Mike Burns. "In addition, year-over-year sales and net income, excluding unusual items, were both up significantly despite a challenging operating environment.

"Certainly, we're not yet where we'd like to be. But the improvements to our balance sheet and operational performance were important steps in the continuing transformation of Dana, and I am proud of what our people accomplished in 2004."

\* \* \*

2005 Outlook

"This will be another tough year for the automotive industry as well as Dana," said Burns. "We believe North American light vehicle production will be flat at 15.8 million units. We expect to see continuing pressure on raw material prices and energy costs, particularly in the first half of the year. And, as a company, we will also face the near-term challenge of replacing the lost earnings from the automotive aftermarket businesses that were sold, as well as the reduced earnings contribution from Dana Credit Corporation as we continue to wind that business down.

"On the other hand, we have renewed our focus on our global original equipment manufacturers. In fact, we already have an additional $410 million in net new business, which comes on in 2005. And we're very optimistic about the outlook for the commercial vehicle and off-highway markets. We're anticipating a 13 percent increase in North American Class 8 truck production to 293,000 units. The combination of these factors should allow us to increase our 2005 full-year sales to $9.6 billion.

"The increased sales alone however will not be enough to offset the challenges we face. So we will be relentless in pursuing our cost-reduction objectives. We will continue to deploy lean manufacturing and value engineering throughout the organization and streamline our administrative processes. *These efforts, along with better leverage from our consolidated purchasing function, are expected to gain more momentum and therefore provide greater benefit to our bottom line as the year progresses*.

81.     Dana's financial results for FY:04 were repeated in the Company's Form 10-K filed with the SEC on or about March 9, 2005. The Form 10-K contained the signatures of defendants Richter, Burns, Baillie, Berges, Carpenter, Gabrys, Gibara, Grisé, Kelly, Marks and Priory. The Form 10-K also contained certifications signed by defendants Richter and Burns under section 302 of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical to Dana's 3Q:02 Form 10-Q certification.

82.     On March 23, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Revises Earnings Outlook." The press release stated

in relevant part:

> Dana Corporation today announced that it has revised its first-quarter 2005 earnings outlook to a range of 11 to 13 cents per share, from its previously announced range of 17 to 23 cents per share.
>
> Dana Chairman and CEO Michael J. Burns said the reduction is primarily attributable to three factors:
>
> - Higher-than-expected material costs, including the effect of the increased cost of steel to Dana's suppliers and other factors;
>
> - A current component shortage from a principal supplier that has resulted in reduced shipments of heavy-duty axles: and
>
> - Lower-than-expected North American light-vehicle production rates on key platforms.
>
> Mr. Burns added. "We are hopeful that we will see less pressure on material price increases during the balance of the year, but we can't count on this. We are accelerating our cost-reduction efforts to pull forward savings to offset the potential impact of continued pressure on material costs. Regarding the component shortage that has reduced heavy-duty axle shipments, we are working closely with the supplier to resolve the situation and are confident that we will see a substantial improvement in the second quarter. However, given the uncertain outlook for the light-vehicle industry in general, as well as on commodity prices, we feel it is prudent to lower our 2005 full-year guidance to $1.30 to $1.45 per share. from our previous guidance of $1.40 to $1.62 per share."

83.     On April 20, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Reports First-Quarter Results for 2005." The press release stated in relevant part:

> Dana Corporation today announced that its 2005 first-quarter sales were $2.5 billion. compared to $2.3 billion during the same period last year. Net income for the quarter totaled $18 million, or 12 cents per share. versus $65 million. or 43 cents per share, for the period in 2004.
>
> * * *
>
> Dana Chairman and CEO Mike Burns said 2005 first-quarter earnings were impacted by several external factors. "The single greatest factor impacting our earnings was roughly $32 million in additional steel costs that we incurred compared to the first quarter of 2004," he said. "This is an after-tax number and is net of what we've recovered from our customers.
>
> "In addition, this year's results were affected by a component shortage from a principal supplier. which resulted in reduced shipments of heavy-duty axles in March." Mr. Burns said. "The component shortage also affected the operating efficiency in our Heavy Vehicle group and led to significantly higher levels of inventory on other related components.

84.     Dana's financial results for 1Q:05 were repeated in the Company's Form 10-Q filed

with the SEC on or about May 6, 2005. The Form 10-Q was signed by defendant Richter. The

Form 10-Q also contained certifications signed by defendants Richter and Burns under section 302

of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical

to Dana's 3Q:02 Form 10-Q certification.

85.     On July 20, 2005, the Individual Defendants caused or allowed the Company to issue

a press release entitled "Dana Corporation Reports Second-Quarter Results." The press release

stated in relevant part:

> Dana Corporation today reported financial results for the second quarter of 2005,
> which showed significant improvement over results for the first three months of the
> year. Second-quarter highlights included:
>
> * Sales of $2.6 billion were up 6 percent from the first quarter of 2005;
>
> * The addition of $215 million in net new business for the years 2005 to 2007
>   raised total net new business for this period to $1.3 billion;
>
> * Higher sales and cost savings drove operating profit improvements of 53
>   percent in the Automotive Systems Group and 48 percent in the Heavy
>   Vehicle Technologies and Systems Group; and
>
> * Net income. exclusive of unusual items, increased to $53 million, or 35 cents
>   per share, compared to $18 million, or 12 cents per share, during the first
>   three months of 2005. Unusual items in the second quarter included a net
>   charge of $5 million related to enactment of new Ohio tax legislation and a
>   $3 million net gain from the sale of certain Dana Credit Corporation (DCC)
>   assets. With these unusual items, net income totaled $51 million, or 34 cents
>   per share.
>
> "In the face of continuing industry-wide challenges, *Dana people have made
> significant progress in strengthening our company*," said Dana Chairman and CEO
> Mike Burns. "Specifically, our lean manufacturing and value engineering programs
> are delivering tangible results as evidenced by the substantial profit improvement
> from last quarter. "Our cost reduction and efficiency programs are essential. But
> equally important to achieving our goals is our aggressive pursuit of steady top-line
> growth," Mr. Burns said. "*To this end, we are extremely pleased to report that we
> have added another $215 million in the second quarter to our increasingly strong -
> - and diverse -- book of new business*."
>
> * * *
>
> "We are encouraged by the profit improvement we've achieved since last
> quarter," Mr. Burns said. "And we believe there is considerable opportunity to
> achieve additional cost savings and process efficiencies as our efforts gain more
> momentum.
>
> "Production schedules for North American heavy trucks continue to be
> stronger than expected and, as a result, we are raising our estimate for full- year 2005
> production to 310,000 units from 293,000 units. The off-highway market segments
> we serve are also expected to remain strong for the rest of the year," he said. "*We're
> also expecting to benefit from subsiding steel costs*, which will be particularly

important to the Automotive Systems Group.

86.    Dana's financial results for 2Q:05 were repeated in the Company's Form 10-Q/A filed

with the SEC on or about May 13, 2005. The Form 10-Q/A was signed by defendant Richter. The

Form 10-Q also contained certifications signed by defendants Richter and Burns under section 302

of the Sarbanes-Oxley Act of 2002. The certification used language that was substantially identical

to Dana's 3Q:02 Form 10-Q certification.

## THE TRUTH IS REVEALED

87.    On September 15, 2005, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Dana Corporation Revises 2005 Earnings Outlook, Restatement of

Second-Quarter 2005 Financial Statements Likely." The press release stated in relevant part:

> *Dana Corporation today announced that it has revised its 2005 full-year earnings*
> *outlook to a range of $90 million to $105 million, or approximately 60 to 70 cents*
> *per share, from its previously announced range of $196 million to $219 million, or*
> *$1.30 to $1.45 per share.* In both cases, the outlook excludes gains and losses on
> divestitures and asset sales, and other unusual items.
>
> The company is assessing whether, as the result of the change in earnings
> outlook, it will be required to write down its U.S. deferred tax assets. A write-down
> of U.S. deferred tax assets and the consequent inability to record similar tax benefits
> in the future would not have a cash impact, but would have a *direct negative impact*
> *on the revised 2005 full-year earnings outlook set forth above.* At June 30, the
> company's U.S. deferred tax assets totaled approximately $740 million. The *revised*
> *outlook includes approximately $60 million of tax benefits on domestic losses in*
> *the second half.*
>
> Dana Chairman and CEO Michael J. Burns said that this reduction reflects a
> reassessment of the company's full-year outlook after reviewing its preliminary
> results through the end of August. These results indicate that the company is being
> negatively impacted by continued higher-than-expected costs for steel and other
> materials, as well as increased energy costs. In addition, the company's Commercial
> Vehicle business has been unable to achieve projected cost reductions and is
> experiencing significant manufacturing inefficiencies. For these reasons, the
> company now expects that the Commercial Vehicle unit's performance in the balance
> of the year will be substantially below previous projections. Although less
> significant, results in the company's Automotive Systems business have been
> impacted by lower-than-anticipated light-vehicle production volumes on vehicles
> with significant Dana content.
>
> "We are considering a number of significant measures, both operational and
> strategic, to improve our financial performance," Mr. Burns said. "We are acting
> swiftly and will make further announcements regarding our plans as soon as
> appropriate."
>
> * * *
>
> Company Likely to Restate Second-Quarter 2005 Financial Statements

*Dana also announced that it will likely restate its second-quarter 2005 financial statements, primarily to correct inappropriate recognition of price increases in its Commercial Vehicle business during the second quarter.*

Based on a preliminary internal review, the company believes that the potential restatement could result in an after-tax reduction of approximately $10 million to $15 million in second-quarter income. The actual amount is subject to the completion of the review process. The company's independent registered public accounting firm has been advised of the company's preliminary findings to date and is also reviewing the situation.

88.    On October 10, 2005, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Dana Corporation to Restate Financial Statements for 2004 & 2005,

Write Off U.S. Deferred Tax Assets; Company Postpones Third-Quarter 2005 Earnings Release."

The press release stated in relevant part:

*Dana Corporation today announced that it will restate its 2004, first-quarter 2005, and second-quarter 2005 financial statements. Also, the company has postponed its third-quarter 2005 earnings release and is withdrawing its earnings guidance for full-year 2005.*

Restatement of Financial Statements

Dana's management and the Audit Committee of the Board of Directors have determined, as a result of their ongoing internal investigations, that the company did not properly account for certain items during 2004 and the first and second quarters of 2005. As a result, management and the Audit Committee have concluded that Dana's financial statements for these periods should no longer be relied upon and that restatements will be required for these periods. The primary purpose for the restatements is to correct issues involving customer pricing and transactions with suppliers in Dana's Commercial Vehicle business.

The company's conclusions were reached in consultation with its independent registered public accounting firm, PricewaterhouseCoopers LLP, and independent investigators retained by the Audit Committee. The company will file amended reports on Forms 10-K/A and 10-Q/A for the periods being restated.

In connection with the restatements, *the company believes that there are material weaknesses in its internal control over financial reporting*.

The company has not completed its investigations. It has not determined whether it will be necessary to revise the estimated impact on second-quarter income of $10-15 million after tax, which it reported on Sept. 15, based on information available at that time from its preliminary review. It has also not determined what additional amounts will be required to adjust the statements for the other periods.

Company to Write Off U.S. Deferred Tax Assets

On Sept. 15, the company announced that it was evaluating its ability to maintain its U.S. deferred tax assets in light of the change in its earnings outlook. At June 30, the company reported that its U.S. deferred tax assets totaled approximately $740 million. The company now believes that it will be unable to maintain its U.S. deferred tax assets or to record similar tax benefits in the future. The company is assessing the impact of this on its financial statements. The write-off of the U.S.

- 29 -

deferred tax assets and the inability to record similar tax benefits in the future has a direct negative impact on net income but does not impact the company's cash flow.

Company Assessing Impact on Financial Agreements

Following the announcement on Sept. 15 that it would likely restate its second-quarter financial statements, the company received certain necessary waivers under its five-year bank facility and its accounts receivable securitization agreement for the second quarter. The company also received a waiver of the financial covenants under its bank facility for the third quarter. The company is now assessing the impact of the additional restatements and the decision to write off the U.S. deferred tax assets on its obligations under those credit facilities and other agreements.

Third-Quarter Earnings Release Postponed

As a result of the restatements, Dana will not release its third-quarter 2005 results on Oct. 19, as previously anticipated. At this time, no date has been set for the third-quarter release.

89.     On December 23, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Dana Corporation Provides Update on Restatements." The press release stated in relevant part:

Dana Corporation announced today that it is nearing completion of the restatements of its financial statements for the first two quarters of 2005 and prior years, and reaffirmed that it expects to file amended annual and quarterly reports for the applicable periods with the U.S. Securities and Exchange Commission prior to the end of the year.

The primary items prompting the restatements were issues involving customer pricing and transactions with suppliers in Dana's Commercial Vehicle business. These and other matters have been the subject of internal investigations conducted by management and the Audit Committee of Dana's Board of Directors in consultation with independent investigators retained by the Audit Committee and have been reviewed with the company's independent registered public accounting firm, PricewaterhouseCoopers LLP.

The total reduction in net income after tax for all periods to be restated is now expected to be approximately $50 million. This amount exceeds earlier estimates due to the effect of a correction with respect to steel surcharges in the prior calculation of the company's 2004 LIFO inventory reserves.

90.     On December 30, 2005, the Individual Defendants caused or allowed the Company to announce that it had completed a restatement of FY:00 to Q2:05. The net effect of the restatement was to reduce net income after tax for all periods by $44 million. The *Associated Press* published an article concerning the restatement entitled "Auto Parts Supplier Dana Corp. Lowers Net Income by $44 Million in Amended Reports to the SEC." The article stated in relevant part:

*Auto parts supplier Dana Corp. said Friday it lowered profits by $44 million for a period starting in 2000 and ending in June in adjusted reports to the Securities and*

*Exchange Commission.*

Dana filed amended financial statements for the first quarter of 2000 through the first two quarters of 2005, completing a company review of its financial reports. *It said the changes were caused by improper accounting for customer pricing increases and supplier reimbursement costs in the company's commercial vehicle unit.*

"*During our investigations, we identified material weaknesses in our system of internal control over financial reporting and we have taken, and will continue to take, appropriate actions to remediate these weaknesses,*" said Michael Burns, Dana's chairman and chief executive.

The amended reports show that Dana earned $2.94 billion -- down from the previously reported $2.98 billion -- for the period in question.

91.    On February 1, 2006, the Individual Defendants caused or allowed the Company to file a Form 8-K with the SEC that announced that the SEC had initiated a formal investigation into Dana's accounting improprieties. The Form 8-K stated in relevant part:

In September 2005, Dana Corporation (Dana) reported that management was investigating accounting matters arising out of incorrect entries related to a customer agreement in its Commercial Vehicle business unit and that the Audit Committee of Dana's Board of Directors had engaged outside counsel to conduct an independent investigation of these matters. Outside counsel informed the Securities and Exchange Commission (SEC) of the commencement, nature and scope of the independent investigation and volunteered full cooperation with the Staff of the SEC.

During October and November 2005, Dana reported the preliminary findings of the ongoing investigations and the determination that the company would restate its financial statements for the first and second quarters of 2005, and for the years 2002 through 2004.

On December 30, 2005, Dana filed Forms 10-Q/A for the periods ended June 30 and March 31, 2005, and a Form 10-K/A for the year ended December 31, 2004, containing such restated financial statements. The investigation undertaken by the Audit Committee concluded at about the same time.

Throughout the period of the investigation, outside counsel engaged by the Audit Committee cooperated with the Staff of the SEC, supplied information requested by the Staff, and met or spoke with the Staff periodically.

*Dana has now been advised that the SEC issued a formal order of investigation with respect to matters related to the company's restatements.* The SEC's investigation is a non-public, fact-finding inquiry to determine whether any violations of the law have occurred. Dana will continue to cooperate fully with the SEC in its investigation of these matters.

## REASONS STATEMENTS WERE IMPROPER

92.    The true facts, which were known or should have been known by each of the Individual Defendants but concealed from the investing public and the Company's shareholders

during the Relevant Period, were as follows:

(a)    the Company lacked requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts:

(b)    the Company lacked the necessary personnel to issue accurate financial reports and projections;

(c)    the Company's financial statements were presented in violation of GAAP as described herein; and

(d)    as a result of (a)-(c) above, the Company restated FY:00 through 2Q:05.

## IMPROPER FINANCIAL REPORTING

93.    The Individual Defendants caused or allowed Dana to admit that it inappropriately overstated earnings for FY:00 to 2Q:05, and that it had restated those results because Dana's FY:00 to 2Q:05 financial statements were not a fair presentation of Dana's results and were presented in violation of GAAP and SEC rules.

94.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

95.    The fact that Dana has restated its financial statements for FY:00 to 2Q:05 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Dana was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes

confidence by investors in the financial statements. it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances. *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Dana's restatement was not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatement is an admission by Dana that its previously issued financial results and its public statements regarding those results were false.

96.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP. including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

97.     Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

98.     As a result of the Individual Defendants' actions, Dana's market capitalization has been damaged by over $2.08 billion.

## DERIVATIVE ALLEGATIONS

99.     Plaintiff brings this action derivatively in the right and for the benefit of Dana to redress injuries suffered, and to be suffered, by Dana as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Dana is named as a nominal

defendant solely in a derivative capacity.

100.    Plaintiff will adequately and fairly represent the interests of Dana in enforcing and prosecuting its rights.

101.    Plaintiff is and was an owner of the stock of Dana during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

102.    On October 28, 2005, plaintiff Staehr made a demand upon Dana's Board pursuant to Va. Code Ann. §13.1-672.1, to commence legal action on behalf of Dana against those responsible for causing the Company to engage in unlawful conduct, failing to oversee the Company's press releases and internal controls to prevent such misconduct, causing the Company to issue false and misleading statements regarding financial reporting and business prospects, and exposing the Company to staggering potential liability for the foregoing violations. Additionally, plaintiff Staehr demanded that the legal proceeding should seek recovery of millions of dollars in salaries, bonuses, retirement benefits and long term compensation paid to directors and officers in connection with their past and ongoing wrongdoing. A true and correct copy of the demand letter is attached hereto as Exhibit A.

103.    On January 25, 2005, defendants Gabrys, Carpenter, Gibara, Grisé and Marks sent a response to plaintiff indicating that Dana's Audit Committee and "independent directors" had decided to reject plaintiff's demand. The Audit Committee and "independent directors" based their decision upon investigations that were conducted between September 2005 and December 2005. A true and correct copy of defendants' refusal of plaintiff's demand is attached hereto as Exhibit B.

104.    Defendants' reliance on this investigation is disingenuous. Although, defendants' letter indicates that "no restrictions" were placed upon the investigation, it fails to indicate that the investigation examined Dana's top officers' and directors' involvement and/or liability for the underlying accounting improprieties. The letter merely indicates that the investigation "examined the internal controls, accounting and reporting issues related to the 2005 restatement." The letter does not indicate that the investigation examined, *inter alia*, Dana's corporate governance, Audit Committee procedures, the Board's supervision of operations, the CEO and Chief Financial Officer's

- 35 -

management of operations, or other issues concerning defendants' involvement and/or responsibility for Dana's financial reporting. Thus, not surprisingly, the investigation "found no evidence whatsoever of any bad faith, breach of loyalty, willful misconduct, or knowing violation of the law" because the investigation was not concerned with such evidence. A follow-up investigation should have been conducted that specifically examined these issues before the Board egregiously decided to refuse plaintiff's demand and conclude that plaintiff's demand was not "in the best interests of Dana."

105.    The Board's refusal to conduct a proper investigation into Dana's top officers and directors involvement and/or liability for the accounting proprieties that lead the restatement of the Company's FY:00 through 2Q:05 financial statements was unreasonable and in bad faith. This decision to refuse to further investigate the matters outlined in plaintiff's demand is especially egregious in the context of the SEC's formal order of investigation announced by the Company on February 1, 2006.

106.    Despite having demand refused, plaintiff is filing this action pursuant to Va. Code Ann. §13.1-672.1 because the Board failed to act in good faith for the best interests of the Company. The Company will be harmed if this action does not proceed for, among others, the following reasons:

(a)    It is highly likely that the claim period during which a claim must be made against the Company's relevant directors' and officers' liability insurance policies will lapse. If such period does lapse, Dana will forever be prevented from making a claim against the Company's directors' and officers' insurance policies for the egregious misconduct, which resulted in massive damages to the Company;

(b)    If Dana's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Dana. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly

by Dana against these defendants, known as. *inter alia*. the "insured versus insured exclusion." As a result. if these directors were to sue themselves or certain of the officers of Dana, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause Dana to sue them, since they will face a large uninsured liability:

        (c)      In order to bring this action for breaching their fiduciary duties, the members of Dana's Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances. interests and dependencies. which they would not do.  To the extent that defendants will not take the immediate actions necessary to protect and preserve the rights of the Plaintiff and the public shareholders of the Company, irreparable injury will occur as detailed in (a) and (b) above: and

        (d)      The Company will suffer from what is known as the "liar's discount" for the near future due to being implicated in the securities fraud and regulatory actions and for that reason was recently down-graded by several debt rating agencies.  Unless Plaintiff is able to effect some change at Dana. including replacing the conflicted board members, the Company will have difficulty to reissue debt and/or will have to reissue it on unfavorable terms and will risk losing its credit facility.

## COUNT I

### Against Defendants Burns and Richter for Disgorgement
### Under the Sarbanes-Oxley Act of 2002

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.    Dana has announced that it has restated its financials based upon accounting improprieties that occurred during FY:00 to Q2:05.  Dana has recorded adjustments totaling $44 million in its financial statements.  Pursuant to the Sarbanes-Oxley Act of 2002 §304. defendants Burns and Richter as Dana's CEO and Chief Financial Officer are required to reimburse Dana for all

bonuses or other incentive-based or equity-based compensation received by them from Dana during 3Q:02 through 2Q:05 of the restatement period.

109.     Defendants Burns and Richter are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Dana.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

110.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.     The Individual Defendants owed and owe Dana fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Dana the highest obligation of good faith, fair dealing, loyalty and due care.

112.     The Individual Defendants, and each of them. violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

113.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

114.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Dana has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

115.     Plaintiff on behalf of Dana has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

116.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.     The Individual Defendants' misconduct alleged herein constituted an abuse of their

ability to control and influence Dana, for which they are legally responsible.

118.    As a direct and proximate result of the Individual Defendants' abuse of control, Dana has sustained significant damages.

119.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

120.    Plaintiff on behalf of Dana has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Dana in a manner consistent with the operations of a publicly held corporation.

123.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Dana has sustained significant damages in excess of hundreds of millions of dollars.

124.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

125.    Plaintiff on behalf of Dana has no adequate remedy at law.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Dana to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or

legal costs to defend defendants' unlawful actions.

128.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

129.    Plaintiff on behalf of Dana has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

130.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Dana.

132.    Plaintiff, as a shareholder and representative of Dana, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Declaring that defendants Burns and Richter are liable under the Sarbanes-Oxley Act of 2002 and ordering disgorgement to Dana for all bonuses or other incentive-based or equity-based compensation received by them from Dana, respectively, from 3Q:02 to 2Q:05;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on defendants' assets so as to assure that plaintiff on behalf of Dana has an effective remedy;

D.    Awarding to Dana restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E.    Directing Dana to take all necessary actions to reform and improve their corporate

governance and internal procedures to comply with the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Dana to nominate at least three candidates for election to the Board;

3.      appropriately test and then strengthen the internal audit and control functions; and

F.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 2, 2006                    WILLIAM J. LUCAS CO., L.P.A.


                                        WILLIAM J. LUCAS CO.
                                        (Supreme Ct. #0008268)
                                        1360 West 9th Street, Suite 200
                                        Cleveland, OH 44113
                                        Telephone: 216/771-8340
                                        Facsimile: 216/522-9007
                                        lucaslpa@hotmail.com

                                        Attorney for Plaintiff

## VERIFICATION

I, William J. Lucas, hereby declare as follows:

1.     I am a member of the law firm of William J. Lucas Co., LPA, counsel for plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.     I make this Verification because plaintiff is absent from the County where I maintain my office.

Executed this 2nd day of March, 2006, at Cleveland, Ohio.

_____
William J. Lucas